[Nos. 75635-0; 76195-7.   En Banc.]
Argued May 10, 2005.     Decided August 4, 2005.

THE STATE OF WASHINGTON, *Respondent*, v. BYRON LEE BROWN, *Petitioner*.

*In the Matter of the Personal Restraint of* BYRON LEE BROWN, *Petitioner*.

*Pattie Mhoon*, for petitioner.

*Arthur D. Curtis, Prosecuting Attorney*, and *James E. David* and *Thomas C. Duffy, Deputies*, for respondent.

¶1 SANDERS, J. — In his direct appeal, Byron Lee Brown brings a *Blakely*[1] challenge to the exceptional sentence imposed on him by the trial court under both the "major economic offense" and "free crimes" doctrines. In his personal restraint petition (PRP) filed directly with this court, Brown claims that he was unconstitutionally seized under this court's recent decision, *State v. Rankin*, 151 Wn.2d 689, 92 P.3d 202 (2004), when an officer requested identification and ran a warrants and license check without any articulable suspicion of wrongdoing. We agree the seizure was contrary to the constitution and grant the petition, rendering the *Blakely* issue moot.

## FACTS AND PROCEDURAL HISTORY

¶2 Brown was convicted of multiple counts of forgery, identity theft, and second degree stolen property. He was a passenger in a station wagon displaying an Oregon trip permit which was stopped at 10:48 P.M. by Vancouver Police Officer Jim Watson, who believed the trip permit was "illegal." The officer had his overhead lights and headlights on as he approached the vehicle. After pulling the vehicle

---

[1] *Blakely v. Washington*, 542 U.S. 296, 303-04, 124 S. Ct. 2531, 2537, 159 L. Ed. 2d 403 (2004).

over, the officer approached the vehicle on foot on the passenger side.

¶3 As Officer Watson approached the vehicle, another officer arrived. That officer approached the driver's side and took the driver's license.

¶4 Officer Watson "started to walk back, and then I asked the passenger if I could have his name." Report of Proceedings (Apr. 29, 2002) (RP) at 27.[2] Brown gave the name "Jemeliah D. Johnson." The officer then asked for Brown's birth date and where he was from, and Brown said his birth date was June 7, 1977, and he was from California.

¶5 Officer Watson "ran both [the driver and Brown] for driver status and warrants." RP at 28. He also ran a check on the license plate of the vehicle. The records check of the license plate determined it was "flagged sold or just expired," though Officer Watson later testified that he could not recall which. *Id.* The car did not return as registered to either the driver or Jemeliah D. Johnson, but the records/warrants check of the driver came back "clear and current." RP at 28-29.

¶6 The records check revealed no records for the name Brown gave. The officer asked Brown to confirm the name, and when the name returned no records after two additional checks the officer asked Brown for "any license or I.D. on him." RP at 30. Brown said he had left his license in California.

¶7 The officer then asked Brown, "So if I checked your pockets right now, I wouldn't find any identification?" RP at 30. Brown said "no." *Id.* Officer Watson then asked, "Would

---

[2] When the officer was later asked to explain how he phrased his question, the officer testified:

I asked the passenger if I could have his name, and he said, "Sure. It's Johnson, Jemeliah Johnson." I asked for his middle name, and he gave me a name that began with D. And at the time, I just wrote down the initial, I didn't write down the full name.

RP at 27. The officer later testified that he asked Brown for his name "almost immediately" after he pulled the vehicle over. RP at 39.

you mind if I checked you?" *Id*. Brown again said "no," and exited the vehicle. RP at 30-31.

¶8 The officer then searched Brown. The officer located a palm pilot, which the officer opened. In it the officer found a credit card labeled "Plotinum" and bearing the name "Tim W. Cross" along with a hotel key card. RP at 31. After learning from Brown that he was staying across the street, the officers had the hotel manager identify Brown as the person who had registered as "Byron Black." RP at 33. Officer Watson called the credit card company to confirm his suspicions that the credit card might be forged, then arrested Brown. The officers obtained a search warrant for the hotel room, where they found materials for making forged credit cards and forged identification.

¶9 Brown moved to suppress the evidence derived from the seizure and the trial court held a CrR 3.6 hearing on April 29, 2002. The trial court denied the motion to suppress.[3]

¶10 At Brown's sentencing the State recommended that the court run the sentences for identity theft consecutively rather than concurrently, resulting in an exceptional sentence of 114 months. The State argued for the exceptional sentence under RCW 9.94A.535 on two grounds: (1) that the crime constituted a major economic offense involving a high degree of sophistication and (2) that because Brown's offender score was higher than nine some of his crimes would go unpunished, and therefore the standard range sentence was clearly too lenient. The trial court followed the State's recommendation.

¶11 Brown appealed his conviction on multiple grounds. While his case was pending at the Court of Appeals, Brown filed a PRP pro se with that court, claiming that the initial traffic stop leading to his arrest was unlawful because

---

[3] CrR 3.6 requires that "at its conclusion" of a suppression hearing "the court shall enter written findings of fact and conclusions of law." CrR 3.6(b). In Brown's case such findings of fact and conclusions of law were not entered until March 28, 2003, 11 months after the date the suppression hearing was held on April 29, 2002, and more than 3 months after Brown's appellate brief was filed on December 26, 2002.

Oregon trip permits were valid in Washington. The Court of Appeals summarily dismissed that PRP.

¶12 On January 6, 2004 the Court of Appeals affirmed his conviction. Brown moved the Court of Appeals to reconsider its decision. Less than two months after the Court of Appeals denied Brown's reconsideration motion this court issued *Rankin*, 151 Wn.2d 689, which overturned a case the Court of Appeals relied upon to reject Brown's direct appeal. *See State v. Brown*, noted at 119 Wn. App. 1073, 2004 WL 27207, at * 4, 2004 Wash. App. LEXIS 10, at *10-12. *Rankin* was published in the advance sheets on July 20, 2004.

¶13 Brown filed a pro se motion with this court to allow late filing of a petition for review of his direct appeal, which was granted, and the petition was also filed on July 20, 2004. Brown later filed a pro se motion to amend his petition for review to include an issue regarding his exceptional sentence premised on *Blakely*. The court granted Brown's motion but accepted review only of the *Blakely* issue and appointed counsel to assist Brown.

¶14 Brown later filed a pro se PRP in this court, claiming that the intervening *Rankin* case vitiated the seizure during the traffic stop that resulted in his arrest. This court consolidated Brown's PRP with his direct appeal and instructed Brown's appointed counsel to assist with both matters.

ANALYSIS

I. Is Brown procedurally barred from raising *Rankin* in his second PRP?

¶15 The State contends that Brown is barred from raising his *Rankin* challenge to the constitutionality of his seizure because (1) he raised "similar issues" in his first PRP, and (2) he raised the issue in his direct appeal, the Court of Appeals decided against him, and he abandoned it upon appeal to this court.

¶16 The government alleges "RCW 10.73.140 provides strong guidance to the Court that a person is entitled to one petition absent good cause." Resp. to PRP at 12. However, RCW 10.73.140 does not bar the Supreme Court from considering successive PRPs. *In re Pers. Restraint of Johnson*, 131 Wn.2d 558, 563-66, 933 P.2d 1019 (1997). And the issue Brown raised pro se in his first PRP is not similar to the issue he raises in his second PRP. In his first PRP Brown raised the issue of whether an Oregon trip permit was valid on Washington's roads. In his second PRP Brown questioned whether he was unconstitutionally seized when the officer requested identification without an articulable suspicion of criminal activity.

¶17 The State also cites Rule of Appellate Procedure 16.4(d) that "[n]o more than one petition for similar relief on behalf of the same petitioner will be entertained without good cause shown." However, "similar relief" has been defined by this court as the same "grounds," meaning "simply a distinct legal basis for granting relief" having been determined adversely to the applicant on a prior application. *In re Pers. Restraint of Taylor*, 105 Wn.2d 683, 688, 717 P.2d 755 (1986). The legal basis for granting relief if the trip permit had been valid was distinct and separate from the legal basis for granting relief if Brown was unconstitutionally seized when an officer requested identification without an articulable suspicion of criminal activity. Further, even if this court treated Brown's PRP as a request for "similar relief" under RAP 16.4(d), the "good cause" exception to that bar applies. We have held a significant, intervening change in the law, which may result from a decision by this court, is good cause. *Johnson*, 131 Wn.2d at 567; *In re Pers. Restraint of Greening*, 141 Wn.2d 687, 701, 9 P.3d 206 (2000).

¶18 The State also claims that Brown abandoned the *Rankin* issue by not preserving it upon direct review. However, the only authority cited by the State is *In re Personal Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994), and only for the proposition that "a personal

restraint petitioner may not renew an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue." *Id.* at 303 (citing *Taylor*, 105 Wn.2d at 688). The case on which *Lord* relies undermines the State's argument. The seminal *Taylor* case follows the United States Supreme Court in determining that the "ends of justice" are served where " '[i]f purely legal questions are involved, the applicant may be entitled to a new hearing upon showing *an intervening change in the law.*' " *Taylor*, 105 Wn.2d at 688 (quoting *Sanders v. United States*, 373 U.S. 1, 16-17, 83 S. Ct. 1068, 1078, 10 L. Ed. 2d 148 (1963)).

¶19 " '[W]here an intervening opinion has effectively overturned a prior appellate decision that was originally determinative of a material issue, the intervening opinion constitutes a "significant change in the law." ' " *In re Pers. Restraint of Grasso*, 151 Wn.2d 1, 11, 84 P.3d 859 (2004) (quoting *In re Pers. Restraint of Greening*, 141 Wn.2d 687). The Court of Appeals below directly and repeatedly relied upon its fellow Court of Appeals decision in *State v. Rankin*, 108 Wn. App. 948, 33 P.3d 1090 (2001) to reject Brown's challenges to his seizure. This court reversed that decision in *Rankin*, 151 Wn.2d 689. We released our *Rankin* opinion a mere three weeks after Brown was notified that his motion for reconsideration of his Court of Appeals decision had been denied,[4] and a mere six weeks before Brown filed his petition for review in this court. The case was not even published in the advance sheets until July 20, 2004—the *very day* Brown filed his petition for review with this court.

¶20 Further, the State has not been prejudiced by Brown's raising this issue in a PRP rather than his petition for review. Brown could just as easily have moved to amend his petition for review under Title 17 of the Rules of Appellate Procedure, and this court could have granted the motion since Brown's case is also here on direct review.

---

[4] *See* letter from David C. Ponzoha, Court Clerk, to Byron L. Brown dated May 21, 2004. *State v. Rankin* was issued by this court on June 10, 2004.

Prior to this court's accepting Brown's petition for review Brown brought forth the *Blakely* issue, and this court granted Brown's motion to amend the petition simultaneously with granting review only as to that issue. The State suffers no prejudice from a similar approach to Brown's PRP, and the State adequately briefed the merits of Brown's *Rankin* claim.

## II.   Do the facts of this case fall within *Rankin*?

██  ¶21  In *Rankin* we held, "under article I, section 7 [of the Washington Constitution], law enforcement officers are not permitted to request identification from a passenger for investigatory purposes unless there is an independent basis to support the request." *Rankin*, 151 Wn.2d at 699. *Rankin* further stated, "a mere request for identification from a passenger for investigatory purposes constitutes a seizure." *Id.* at 697.[5] An "independent basis" is an "articulable suspicion of criminal activity." *Id.* at 699.

¶22  The State cites numerous pre-*Rankin* cases, but these no longer apply. The State claims that *Rankin* "appears to be in direct conflict" with those prior cases, *see State v. Young*, 135 Wn.2d 498, 957 P.2d 681 (1998); *State v. Armenta*, 134 Wn.2d 1, 948 P.2d 1280 (1997); *State v. Aranguren*, 42 Wn. App. 452, 711 P.2d 1096 (1985). However, as the State observes, in *Rankin* we specifically distinguished *Young*, a case which involved a pedestrian, by noting that "a passenger faced with undesirable questioning by the police does not have the realistic alternative of leaving the scene as does a pedestrian." *Rankin*, 151 Wn.2d at 697.[6]

---

[5] The *Rankin* court also characterized the Court of Appeals opinion it reversed (which the Court of Appeals relied upon in rejecting Brown's direct appeal) as follows:

> The Court of Appeals . . . held that while an officer may not *require* a passenger to provide identification, unless there are independent grounds to question the passenger, the officer may *request* identification.

*Rankin*, 151 Wn.2d at 694.

[6] The State also attempts to distinguish *Rankin* by arguing that the weather is a factor in treating pedestrians and passengers differently. Nowhere in *Rankin* did we make our holding "weather dependent."

¶23 The State attempts to distinguish *Rankin* by arguing that whether a person is seized depends on whether an officer "requested identification and took it away or otherwise told or suggested that the person must remain." Resp. to PRP at 26. *Rankin* makes no distinction regarding an officer's "taking identification away." *Rankin* clearly holds that it is the *request* for passenger identification, without an articulable suspicion of criminal activity, that results in an unconstitutional seizure under article I, section 7. The distinction proposed by the State would vitiate the greater protection afforded by the Washington Constitution, since an officer can investigate an individual by running a warrants and records check without actually taking a driver's license or ID card.

¶24 The State makes a variation of the same argument by noting that the officer didn't ask for Brown's license, but only his name. Again, *Rankin* holds that it is the request for "identification" that violates the constitution, not the removal of a driver's license or other ID card.[7] The State concedes that the officer asked Brown for his name *and* his date of birth *and the state in which he lived.*[8]

¶25 *Rankin* is our most recent case to discuss the seizure of a vehicle passenger by means of an officer's request for identification. The officer requested Brown's name, birth date, and state of residence in order to run a "record check,"

---

[7] Without making the explicit argument, the State implies that "identification" is synonymous with "driver's license" or "ID card." This ignores the plain meaning of the terms "identification" and "identify":

identification . . . : an act or the action of identifying or the state of being identified;

identif[ied] . . . : to establish the identity of.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1123 (2002).

A person asked for his or her name is clearly "identified" and asked for "identification." The State's proposed interpretation would reduce constitutional protections to a word game and allow officers to skirt constitutional mandates by asking folks for their name and only demanding a driver's license or ID card if they received an investigatory "hit" on the name.

[8] The request for birth date and state of residence reinforces our conclusion that Brown's "identification" was requested, since the purpose of this information was clearly to distinguish between driving and criminal records of individuals with similar names.

which included "driver status and warrants." Under *Rankin* Brown was clearly seized when he was asked to identify himself for investigative purposes so the officer could conduct a warrants and records check.

¶26 The State claims that even if Brown was seized, the officer had an articulable suspicion that the vehicle Brown was riding in was stolen. However, as part of this argument the State bootstraps the fact that the name Brown provided did not produce any records.[9] Since the officer was required to have an articulable suspicion of criminal activity *before* he seized Brown by asking Brown to identify himself, that information cannot be factored into the "articulable suspicion" equation.

¶27 To determine whether the officer had an articulable suspicion of criminal wrongdoing we must examine the reasonableness of the officer's actions in view of the facts he knew. *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986). Officer Watson knew:

(1) the vehicle had not been reported stolen;

(2) the driver had a current license and no outstanding warrants;

(3) the license plate matched the description of the vehicle;

(4) the vehicle was not registered to the driver;

(5) the vehicle had an Oregon license plate with a temporary tag on it;

(6) the vehicle had a valid Oregon trip permit, which was apparently not valid to drive on Washington's highways;

(7) the vehicle had either been "flagged sold or just expired," but the officer *could not recall* which on the witness stand;

¶28 In order to find that the officer had an articulable suspicion that the car was stolen, this court would have to conclude that merely driving a borrowed vehicle that *may* have an expired plate or *may* have just been sold raises an articulable suspicion that the vehicle was stolen, even when

___

[9] "This information, *accompanied by the total lack of any indication that Johnson was a real person,* suggested to Officer Watson that he had been lied to, and the car may be stolen." Resp. to PRP at 27 (emphasis added).

the vehicle has not been reported stolen. These facts simply do not raise an "articulable suspicion of criminal activity" as required by *Rankin* to seize a passenger.

## III. *Blakely* challenge

¶29 Given this court's decision on the seizure issue, we need not address Brown's *Blakely* challenge to his exceptional sentence.

## CONCLUSION

¶30 The officer did not have an articulable suspicion of wrongdoing when he seized Brown by requesting Brown identify himself so that the officer could run a records and warrants check. Under *Rankin* evidence obtained as a result of the unlawful seizure must be suppressed.[10] Given that all the evidence against Brown flowed from the unlawful seizure, we grant his personal restraint petition and vacate his convictions.

ALEXANDER, C.J., and C. JOHNSON, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

MADSEN, J., concurs in result only.

¶31 BRIDGE, J. (concurring) — I concur with the majority's conclusion that our recent decision in *State v. Rankin*, 151 Wn.2d 689, 92 P.3d 202 (2004) controls our disposition of this case. I write separately to express my continued disagreement with this court's decision in *Rankin*.

¶32 Today this court holds that, absent an articulable suspicion that a motor vehicle passenger is engaged in criminal activity, a law enforcement officer offends a passenger's constitutionally protected privacy interest when, after lawfully stopping the vehicle, he requests a passen-

---

[10] *Rankin*, 151 Wn.2d at 700; *see also State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986) (holding that if the initial seizure was unlawful, the subsequent search and fruits of that search are inadmissible as fruits of the poisonous tree).

ger's name, date of birth, and state of residence. I didn't see then and I don't see now how article I, section 7 of the Washington Constitution prohibits such a request. Yet, I agree our decision in *Rankin* dictates this conclusion and adherence to the principle of stare decisis compels me to concur with the majority.

¶33 Of equal concern is the majority's apparent equation of asking a person's name with a formal request for identification. *See* majority at 797 n.7. Law enforcement officers, surely, are not prohibited from engaging members of the public in conversation, nor should they be. *Cf. State v. Young*, 135 Wn.2d 498, 510-15, 957 P.2d 681 (1998). I cannot agree, as the majority's dicta implies, *see* majority at 797 n.7, that the most basic element of human interaction, asking an unfamiliar person his or her name, is analogous to the "request [for] identification" this court found unconstitutional in *Rankin*. 151 Wn.2d at 699. A law enforcement officer's inquiry of a person's name does not, objectively viewed, constitute a show of authority amounting to a seizure. *Cf. State v. O'Neill*, 148 Wn.2d 564, 576, 581, 62 P.3d 489 (2003) ("It is important to bear in mind that the relevant question is whether a reasonable person . . . would feel he or she was being detained.").

¶34 However, under the facts of this case, I must agree with the majority that according to the dictates of *Rankin*, Brown's state constitutionally protected rights were violated when a law enforcement officer asked him, without an articulable suspicion of criminal activity, to identify himself by his name, date of birth, *and* state of residence for the sole purpose of conducting a warrants and records check. This request had the same effect as one for formal "identification" and, according to *Rankin*, effectuated an unconstitutional seizure. Majority at 798; *Rankin*, 151 Wn.2d at 699-

700. Therefore, I concur that Brown's personal restraint petition should be granted and his convictions vacated.