**FILED**
**AUGUST 30, 2018**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 35169-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| COREY K. KNUDSVIG, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Corey K. Knudsvig appeals after his stipulated bench trial conviction of possession of a controlled substance—heroin. He argues the trial court erred when it denied his suppression motion. He contends he was unlawfully seized when an officer ordered him out of a car and asked his name. We conclude that the officer had justifiable safety reasons for her actions and that her actions were in furtherance of a lawful criminal investigation. We therefore affirm the trial court's order denying suppression.

FACTS

*Background*

Deputy Clay Hilton was on routine patrol one evening in Spokane Valley, Washington. He saw a white minivan parked in the driveway adjacent to a suspected drug house. The area is a high crime area.

Deputy Hilton drove past the house and ran the minivan's license plate. He determined that the registered owner of the minivan was Justin Millette, who had outstanding arrest warrants.

Deputy Hilton returned to the minivan. He got out of his patrol car and approached. He saw a man standing near the driver's side door and asked the man if he owned the minivan and for his name. The man responded that he did, and that he was Justin Millette.

Because there were multiple occupants in the minivan, Deputy Hilton requested backup so he could safely arrest Millette. As deputies began to arrive, Deputy Hilton handcuffed Millette and walked him to his patrol car. As he was doing this, a minivan occupant opened the back sliding door and stepped out to walk away. Deputy Hilton heard a thud and saw that a handgun had fallen out of the minivan and was on the ground under the sliding door. At that time, he could not tell if the gun was real.

2

After seeing the gun, no one in the minivan was free to leave. Deputy Hilton testified that officers are trained, "[w]here there's one weapon, there's two, and until we pat search the people we're dealing with to make sure they're not armed, nobody [is] free to leave." Report of Proceedings (RP) (Jan. 26, 2017) at 28.

Deputy Hilton walked to the gun, picked it up, and placed it on the hood of his patrol car. Because many things were happening at once—arresting Millette, a minivan occupant trying to walk away, and backup arriving—Deputy Hilton did not inspect the gun at that time. Deputy Hilton then ordered a female occupant out of the minivan, identified her, and searched her for weapons.

A second deputy identified and searched the man who had attempted to walk away. The deputies identified and searched the occupants "to make sure there were no other weapons," and "to see if people have a concealed weapons permit [and to] know who we're dealing with basically." RP (Jan. 26, 2017) at 19.

Deputy Veronica Van Patten arrived to assist. She arrived after Deputy Hilton had placed the handgun on his patrol car. She noticed the gun on the patrol car and saw other deputies detaining people associated with the minivan. Based on what she saw, she correctly inferred that there was an officer safety issue and that an investigation was taking place.

3

Deputy Van Patten could not see into the back of the minivan because the windows were tinted and it was dark outside. She asked the female if there was anyone in the back of the minivan, and she answered there was. Deputy Van Patten then ordered the unseen person out. After the person stepped out, the deputy asked him his name. He gave his correct name, Corey Knudsvig. Deputy Van Patten ran his name through dispatch and learned that Knudsvig had an active warrant for his arrest.

Deputy Van Patten searched Knudsvig incident to arrest and found a small "baggie" in his coin pocket. The contents of that baggie later tested positive for heroin.

The deputies' search revealed pocket knives and other weapons, but no additional firearms. After the search for weapons, Deputy Hilton examined the handgun. It was at this time he realized it was a BB gun.

*Procedure*

The State charged Knudsvig with possession of a controlled substance—heroin. Knudsvig moved the trial court to suppress evidence of the heroin. He contended that because he was only a passenger in the minivan, his seizure was unconstitutional.

Deputy Hilton and Deputy Van Patten testified at the suppression hearing. At the conclusion of the hearing, the trial court analyzed the facts and law and ruled that Knudsvig's seizure was lawful for officer safety concerns. The case proceeded to a

stipulated facts bench trial before a different judge. That judge found Knudsvig guilty of the charged crime.

Knudsvig appealed.

## ANALYSIS

This court reviews a trial court's ruling on a suppression motion to determine whether substantial evidence supports the trial court's challenged findings of fact, and if so, whether the findings support the trial court's conclusions of law. *State v. Radka*, 120 Wn. App. 43, 47, 83 P.3d 1038 (2004). When the appellant does not challenge the findings, as in this case, the findings are verities on appeal. *State v. Lohr*, 164 Wn. App. 414, 418, 263 P.3d 1287 (2011). This court reviews conclusions of law de novo. *Radka*, 120 Wn. App. at 47.

### A.    DENIAL OF SUPPRESSION MOTION

Knudsvig argues the trial court erred by refusing to suppress the evidence because officer safety concerns do not extend to asking vehicle occupants their identities. The State counters that the circumstances of this case justified ordering Knudsvig out of the minivan and asking him for his name. We agree.

a.      *Officer safety justified the seizure and request for identification*

When presented with arguments under both the state and federal constitutions, this court first analyzes the Washington Constitution because it offers more protection than the federal constitution.  *State v. Hinton*, 179 Wn.2d 862, 868, 319 P.3d 9 (2014).  Under article I, section 7 of the Washington Constitution, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."  This provision protects citizens from governmental intrusion into their private affairs without the authority of law and comes from a broad right to privacy in Washington.  *Hinton*, 179 Wn.2d at 868.  The analysis under article I, section 7 requires this court to determine whether the State unreasonably intruded into the defendant's private affairs.  *State v. Mendez*, 137 Wn.2d 208, 219, 970 P.2d 722 (1999).

"[A] warrantless search or seizure is considered per se unconstitutional unless it falls within one of the few exceptions to the warrant requirement."  *State v. Rankin*, 151 Wn.2d 689, 695, 92 P.3d 202 (2004).  The recognized exceptions include "consent, exigent circumstances, searches incident to a valid arrest, inventory searches, plain view searches, and investigative stops."  *State v. Chacon Arreola*, 176 Wn.2d 284, 292, 290 P.3d 983 (2012).  "If police unconstitutionally seize an individual prior to arrest, the

exclusionary rule calls for suppression of evidence obtained via the government's illegality." *State v. Harrington*, 167 Wn.2d 656, 664, 222 P.3d 92 (2009).

This court first determines whether a warrantless search or seizure has taken place and, if so, whether it was justified by an exception to the warrant requirement. *Rankin*, 151 Wn.2d at 695. A rationale predicated on officer safety concerns is satisfactory. *Mendez*, 137 Wn.2d at 219. Where an officer's conduct is connected to safety concerns, courts are reluctant to substitute their judgment for that of the officer. *State v. Collins*, 121 Wn.2d 168, 173, 847 P.2d 919 (1993).

Here, the parties agree that law enforcement seized Knudsvig when Deputy Van Patten ordered him out of the minivan and requested his identity. The question then is whether officer safety concerns justified the seizure. "A police officer should be able to control the scene and ensure his or her own safety, but this must be done with due regard to the privacy interests of the passenger, who was not stopped on the basis of probable cause by the police." *Mendez*, 137 Wn.2d at 220. An officer must "be able to articulate an objective rationale predicated specifically on safety concerns . . . for ordering a passenger to stay in the vehicle or to exit the vehicle." *Id*. An officer's objective rationale should be evaluated based on the circumstances present at the scene of the traffic stop, including: "the number of officers, the number of vehicle occupants, the

7

behavior of the occupants, the time of day, the location of the stop, traffic at the scene, affected citizens, or officer knowledge of the occupants." *Id*. at 220-21.

In this case, the objective rationale articulated by the officers justifies the seizure for officer safety concerns. Deputy Hilton saw the minivan in a high crime area at night in front of a suspected drug house known for frequent contact with law enforcement. The van had dark tinted windows, and officers were not sure how many people were in the minivan but knew it contained several occupants. When one occupant stepped out of the minivan to walk away, an item that appeared to be a handgun dropped onto the ground. At that point, law enforcement had valid safety concerns in accordance with their training: "[W]here there's one weapon, there's two weapons, and until you can confirm for yourself if a person is not armed, you would assume they are, for safety reasons." RP (Jan. 26, 2017) at 24. The wisdom of this training was proved correct; knives and other weapons were found on the occupants and inside the minivan.

After these safety concerns manifested, Deputy Van Patten ordered Knudsvig out of the minivan. We will not substitute our judgment for reasonable officer training. *Collins*, 121 Wn.2d at 173. We conclude that Deputy Van Patten lawfully seized Knudsvig when she ordered him out of the minivan.

### b. *We decline to review an argument not raised below*

Knudsvig argues that officers should not be permitted to search an occupant of a car simply because another occupant has a firearm. Knudsvig contends that extending officer safety concerns to permit such a search violates citizens' rights to bear arms guaranteed under the Second Amendment to the United States Constitution. Knudsvig did not make this argument to the trial court. We decline to consider it.

A party generally may not raise an argument on appeal that the party did not make to the trial court. *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995). RAP 2.5(a)(3) is a commonly invoked exception that permits review of an unpreserved claim of error. "To meet RAP 2.5(a) and raise an error for the first time on appeal, an appellant must demonstrate that (1) the error is manifest, and (2) the error is truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). Knudsvig does not argue that the issue involves a manifest error affecting a constitutional right. We will not attempt to make his reviewability claim for him.

### c. *The request for identification was lawful*

Knudsvig alternatively argues, if the seizure was justifiable, it went too far when the officer demanded him to identify himself and ran his name through dispatch.

9

A passenger is unconstitutionally detained when an officer requests identification unless other circumstances give the police independent cause to question the passenger. *State v. Larson*, 93 Wn.2d 638, 642, 611 P.2d 771 (1980). To justify such a detention, officers must "'articulate an objective rationale' to support their actions with regard to a passenger in order to prevent 'groundless police intrusions on passenger privacy.'" *State v. Parker*, 139 Wn.2d 486, 496, 987 P.2d 73 (1999) (quoting *Mendez*, 137 Wn.2d at 220).

Here, a handgun apparently fell out of the minivan as one occupant attempted to walk away. The apparent gun likely belonged to one of the three occupants in the minivan. Law enforcement was justified in determining the identities of the three occupants, whether any of the occupants had a valid concealed weapons permit, and whether any of the occupants was a felon and thus prohibited from possessing a firearm.

In addition, Deputy Van Patten's request for Knudsvig to identify himself is likely lawful for a reason not argued by the parties. Deputy Hilton testified that as they began ordering the occupants out of the minivan, he saw "all this clothing that had sales tags on it that were in the van. And so it went from the [registered owner] having warrants to a gun falling out [of] a van full of stolen property . . . ." RP (Jan. 26, 2017) at 23. We may affirm a trial court on any basis supported by the briefing and the record. *Huff v. Wyman*, 184 Wn.2d 643, 648, 361 P.3d 727 (2015). Had we deemed it necessary, we would have

requested supplemental briefing on whether Deputy Van Patten lawfully requested

Knudsvig's identity given that the investigation had expanded to suspected possession of

stolen property.

B.    APPELLATE COSTS

Knudsvig asks this court to not award appellate costs in the event the State

substantially prevails. The State has substantially prevailed. In accordance with

RAP 14.2, we defer the question of appellate costs to our commissioner or

clerk/administrator.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

Lawrence-Berrey, C.J.

I CONCUR:

Korsmo, J.

No. 35169-6-III

FEARING, J. (dissenting) —

> "*[W]here there's one weapon, there's two weapons.*" Testimony of Spokane County Sheriff Deputy Clay Hilton.

This appeal asks the court to test the limits of law enforcement's authority to detain and search individuals, for purposes of officer safety, when the officers spot one gun. In the circumstances of the seizure and search of Corey Knudsvig, officers went beyond those limits. Because officers stepped beyond their authority and because officers engaged in a pretext in order to determine if those present had outstanding warrants for arrest, I dissent. Eastern Washingtonians dearly cherish their rights under the Second Amendment to the United States Constitution and under the Washington Constitution to bear arms and to self-defense. Law enforcement's conduct in searching for guns, under the circumstances of this appeal, implicates those rights.

## FACTS

In response to Corey Knudsvig's motion to suppress evidence, the trial court entertained testimony from two witnesses: Deputy Veronica Van Patten and Deputy Clay Hilton. Clay Hilton initiated the contact with Justin Millette, Knudsvig, and others in Millette's minivan. Veronica Van Patten asked Knudsvig for identification and, after returning to her patrol car and learning from a computer search of an arrest warrant for

Knudsvig, arrested and patted Knudsvig's person and clothing. I add some testimony missing from the majority opinion.

The State argues that the high crime area of Spokane Valley, in which officers detained Corey Knudsvig, presented a basis for detaining and questioning Knudsvig. Deputy Clay Hilton deemed the residence, at which Justin Millette parked his van, to be the location of drug transactions. In fulfillment of the State's contention, the trial court found the location of the search and seizure happened in a high crime area. Nevertheless, Sheriff Deputy Veronica Van Patten never testified that the nature of the area prompted the questioning or search of Corey Knudsvig. The state Supreme Court instructs us that police cannot justify suspicion of criminal conduct based only on a person's location in a high crime area. *State v. Weyand*, 188 Wn.2d 804, 817, 399 P.3d 530 (2017); *State v. Larson*, 93 Wn.2d 638, 645, 611 P.2d 771 (1980). In *State v. Weyand*, law enforcement unlawfully arrested Wesley Weyand as he exited an extensively documented drug house.

As Deputy Clay Hilton arrested Justin Millette, passenger Dara Murphy exited the minivan, and Deputy Hilton heard a thud. According to Hilton, by the time he heard the thump, at least three backup officers, Deputy Nathan Booth, Deputy Veronica Van Patten, and a Deputy Wallace, had arrived and stood next to the van. When he heard the thud, Hilton saw a handgun on the ground under the van's sliding door. Hilton then

2

instructed passengers of the van that they could not leave the area. Hilton declared during the suppression hearing:

Nobody yelled, but whether—through training, you're always told that where there's one weapon, there's two weapons, and until you can confirm for yourself if a person is not armed, you would assume they are, for safety reasons.

Report of Proceedings (RP) (Jan. 26, 2017) at 24. Nevertheless, Hilton saw no suspicious activity occurring inside the van. No passenger brandished a weapon. Corey Knudsvig contends that Deputy Hilton lacked authority to detain all passengers in the van upon eyeing the fallen gun.

Sheriff Deputy Clay Hilton, after securing Justin Millette, in his patrol car, grabbed the fallen gun and placed the weapon on the hood of his patrol car. The gun was a BB gun. Hilton testified perhaps inconsistently as to when he learned the weapon to be a BB gun. He first declared that he discerned the nature of the gun as he placed the gun on the hood. Hilton testified:

Q. At what point did you realize it was a BB gun?
A. I secured it on my hood, and I got it away from the van.

RP (Jan. 26, 2017) at 22. Hilton later averred that he learned the gun was a BB gun after law enforcement officers searched the van and passengers. The trial court made no finding as to, at what time, Clay Hilton realized the gun to be a BB gun.

3

On questioning by law enforcement, Dara Murphy admitted the BB gun to be his gun. Deputy Hilton never testified that the gun was loaded. After placing the gun on the hood of his patrol car, Deputy Clay Hilton next directed the passenger in the driver's seat, Amelia Perez, to exit the vehicle. Hilton frisked her for weapons.

Although Deputy Clay Hilton testified that Deputy Veronica Van Patten was present when the gun cascaded from the minivan, Van Patten testified she arrived after the seizure of all passengers in the vehicle. The side door of the van was open. Deputy Van Patten knew not why the passengers were detained other than the presence of a suspicious car. No one told her why the car was suspicious. She thought officers were engaged in a general criminal investigation. She had no opportunity to ask Hilton as to the reason for the investigation. She wanted to see if criminal activity occurred in the van.

When she arrived at the location, Deputy Veronica Van Patten noticed a gun on the hood of Deputy Hilton's car. Still, Van Patten observed no one brandish a weapon or employ furtive movements. Van Patten testified that the gun on the car raised safety concerns for her, but she never testified that she knew of the source of the gun.

According to Sheriff Deputy Veronica Van Patten, Corey Knudsvig lay on the back seat of the minivan when she arrived. According to Van Patten, Knudsvig then had

4

no right to leave. Deputy Van Patten ordered Knudsvig to exit the minivan while showing his hands. Knudsvig cooperated and exited the van. Despite a purported concern for officer security, Van Patten did not then search Knudsvig. She instead asked him his name. Knudsvig also challenges the action of Van Patten requesting his name as violating his privacy rights under the Washington Constitution.

The State seeks, in part, to justify the questioning of Corey Knudsvig because law enforcement did not know if the owner of the thudding gun possessed a permit for the weapon. Nevertheless, Van Patten did not testify that she searched records to discern if Knudsvig had a gun permit. Van Patten testified that officers needed to question everyone to determine to whom the gun belonged. Nevertheless, she never testified that she asked Knudsvig as to whether he owned the fallen gun. She never testified to any suspicion that Knudsvig owned the thudding BB gun. Neither Deputies Hilton nor Van Patten testified that they took any steps to determine if anyone had licensed the gun or had a concealed gun permit, even before Dara Murphy conceded owning the gun.

Corey Knudsvig honestly disclosed his name to Sheriff Deputy Veronica Van Patten. Deputy Van Patten then employed the computer in her patrol car, and the computer response informed her of an arrest warrant for Knudsvig. Assuming Veronica Van Patten considered Corey Knudsvig a safety threat, she performed inconsistently,

because Knudsvig had the opportunity, while Van Patten employed her squad car computer, to remove a weapon from his person and injure a law enforcement officer. Van Patten searched Knudsvig's person only after learning of an arrest warrant and while consummating the arrest. She testified she patted Knudsvig as a search incident to arrest. She never claimed that she performed a search solely for officer safety.

When Deputy Veronica Van Patten felt inside Corey Knudsvig's clothing, she discovered a small plastic "baggie" of heroin in the right coin pocket of Knudsvig's jeans. Van Patten never claimed that she felt any hard object inside Knudsvig's clothes or that Knudsvig bore any weapon.

The majority repeats testimony of Deputy Clay Hilton that deputies identified and searched the occupants "to make sure there were no other weapons," and "to see if people have a concealed weapons permit; [and to] know who we're dealing with basically." RP (Jan. 26, 2017) at 19. Sheriff Deputy Veronica Van Patten never testified that she searched Corey Knudsvig to determine if he·carried a weapons permit. She searched him only after learning of an arrest warrant and as part of a search incident to arrest.

The majority writes, without bestowing Corey Knudsvig an opportunity to respond, that the search of Corey Knudsvig "is likely lawful" because of clothes with price tags thereon found inside the minivan. Majority at 10. The majority, however, fails

6

to identify a basis on which the officers held authority to search inside the van because of the clothes. The majority does not analyze whether the presence of clothes with price tags thereon creates probable cause that the clothes are stolen. If so, shoppers should beware. If an officer pulls over a judge's husband or wife for a traffic violation and the officer finds clothes with price tags thereon, we would not claim probable cause for a search and seizure. Regardless, Deputy Veronica Van Patten never justified the frisk of Corey Knudsvig based on clothes inside the van. The search inside the van occurred after the seizure of its occupants. Once an officer seizes an individual, no subsequent events or circumstances retroactively justify the seizure. *State v. Mendez*, 137 Wn.2d 208, 224, 970 P.2d 722 (1999).

The majority writes that the officers found knives and a hypodermic needle on one or more passengers. Again, once an officer seizes an individual, no subsequent events or circumstances retroactively justify the seizure. *State v. Mendez*, 137 Wn.2d at 224.

## LAW

When reviewing claims of unlawful searches and seizures, we must isolate discrete actions of law enforcement officers during an extended encounter, as if the actions are separate frames in a movie. We then must ask if the law permitted each of the detached acts. The disconnected actions include Sheriff Deputy Clay Hilton's detaining

7

No. 35169-6-III
*State v. Knudsvig* - dissenting

all passengers in the minivan when he heard the thud on the ground and spied a dropped gun, Sheriff Deputy Veronica Van Patten's ordering of Corey Knudsvig from the van, Deputy Van Patten's insisting that Knudsvig identify himself, and Van Patten's bodily search of Knudsvig.

The State writes in its brief: "As acknowledged by the State during the CrR 3.6 hearing, Mr. Knudsvig was seized when he was ordered out of the minivan and requested to identify himself." Br. of Resp't at 6-7. I agree with the State that Deputy Veronica Van Patten's actions toward Knudsvig constituted a seizure. Nevertheless, the State fails to note that law enforcement previously seized Knudsvig before Van Patten's order to exit the van. Deputy Clay Hilton testified that no passenger in the van was free to leave and law enforcement seized all passengers when Hilton first spotted the tumbled gun. Deputy Veronica Van Patten testified that all passengers lacked the freedom to leave and were seized by the time she arrived at the location. The majority fails to recognize this earlier seizure of Corey Knudsvig and other occupants.

The facts and the law compel a conclusion that law enforcement officers held no authority to detain any passengers in Justin Millette's minivan, Deputy Van Patten lacked grounds to order Knudsvig to exit the van and identify himself, and Van Patten lacked license to frisk Knudsvig. In addition, any detaining and search of Knudsvig entailed a

8

pretext to research for outstanding arrest warrants. The frisk of Knudsvig went beyond permissible grounds. Constitutional principles of privacy demand suppression of the fruit of the unlawful search of Knudsvig's person and dismissal of the prosecution for possession of heroin.

I rely primarily on the Washington Constitution, not the Fourth Amendment to the United States Constitution, in my review. Article I, section 7, provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." That protection encompasses and exceeds the protection guaranteed in the federal Fourth Amendment. *State v. Horrace*, 144 Wn.2d 386, 392 n.2, 28 P.3d 753 (2001).

Spokane County sheriff deputies detained and searched Corey Knudsvig without a judicial warrant. As a general rule, warrantless searches and seizures are per se unreasonable, in violation of the Fourth Amendment and article I, section 7 of the Washington State Constitution. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). Evidence seized in violation of article I, section 7 is inadmissible at trial. *State v. Ladson*, 138 Wn.2d 343, 359, 979 P.2d 833 (1999).

Washington recognizes at least five jealously and carefully drawn exceptions to the warrant requirement, which include exigent circumstances, searches incident to a valid arrest, inventory searches, plain view searches, and *Terry* investigative stops. *State*

*v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). The State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the rule. *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010). This is a strict rule. *State v. White*, 135 Wn.2d 761, 769, 958 P.2d 982 (1998). Exceptions to the warrant requirement are limited and narrowly drawn. *State v. White*, 135 Wn.2d at 769. Whereas, Washington courts repeatedly herald these principles, a court rarely hinges a decision thereon. The principles should teach us that in close calls challenged evidence should be suppressed.

Law enforcement held grounds to arrest Justin Millette, the owner of the vehicle in which Corey Knudsvig was a passenger. The authority to seize Millette, however, afforded the officers no authority to detain Knudsvig. Law enforcement may not search an individual simply because he accompanies or stands in proximity to an arrestee or suspect. *State v. Parker*, 139 Wn.2d 486, 497, 987 P.2d 73 (1999). Merely associating with a person suspected of criminal activity does not strip away the protections of the United States Constitution. *State v. Broadnax*, 98 Wn.2d 289, 296, 654 P.2d 96 (1982), *abrogated on other grounds by Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993).

The State does not contend that law enforcement gained license to question and search Corey Knudsvig merely because of his presence at the scene of Justin Millette's

10

arrest. Instead, it contends that Sheriff Deputy Clay Hilton could seize all passengers and Sheriff Deputy Veronica Van Patten could question and frisk Knudsvig after the tumbling of the gun from the minivan because of officer safety and because of the need to investigate whether the owner of the gun held a license for the concealed weapon. These arguments implicate the search warrant exceptions of exigent circumstances and a *Terry* investigative stop. I address these exemptions in such order. Thereafter, I discuss Deputy Van Patten's questioning and search of Knudsvig being pretextual and the frisk of Knudsvig extending beyond any tolerable strictures of an inspection for officer safety.

## Officer Safety

The law recognizes that under certain circumstances, unarrested individuals may pose a threat to officer safety in an arrest situation. *State v. Horrace*, 144 Wn.2d at 392-93 (2001); *State v. Kennedy*, 107 Wn.2d 1, 11, 726 P.2d 445 (1986). An officer conducting a stop may be endangered not only by the suspect but by companions of the suspect. *State v. Kennedy*, 107 Wn.2d at 11. In the context of a residence search, the doctrine is called the protective sweep doctrine. *State v. Smith*, 137 Wn. App. 262, 268, 153 P.3d 199 (2007), *aff'd*, 165 Wn.2d 511, 199 P.3d 386 (2009). Although pigeonholing law enforcement conduct into a specific warrant exemption is unnecessary,

a search for police security falls within the exigent circumstances exception. *State v. Smith*, 165 Wn.2d at 517.

Detaining, questioning, and searching someone not suspected of a crime for officer safety encounters limits. In analyzing the authority of Deputy Veronica Van Patten during her contact with Corey Knudsvig, I separate her questioning of Knudsvig from her patting of Knudsvig.

I first review Sheriff Deputy Veronica Van Patten's demand for identification. An officer may ask a person accompanying an arrested individual for identification and may search the individual only in circumscribed circumstances. Officers may not require people in a car other than the driver to give identification unless circumstances give the police independent cause to question the passenger. *State v. Larson*, 93 Wn.2d at 642 (1980). If an officer deems an individual a danger, the officer need not know the identity of the person in order to allay the danger. Therefore, a request for identification is not reasonably related to officer safety and impermissible. *State v. Rankin*, 151 Wn.2d 689, 699 n.5, 92 P.3d 202 (2004).

An officer may not request identification and run a warrant search and license check without any articulable suspicion of wrongdoing. *State v. Brown*, 154 Wn.2d 787, 796, 117 P.3d 336 (2005); *State v. Rankin*, 151 Wn.2d at 699. A random request for

12

identification constitutes the sort of request uncomfortably associated with authoritarian societies. *State v. Rankin*, 151 Wn.2d at 698. Therefore, Deputy Veronica Van Patten's demand to Corey Knudsvig to identify himself lacked validity, even if motivated by officer security. She should have immediately frisked him, rather than seek information to arrest him on an outstanding warrant.

In *State v. Brown*, 154 Wn.2d 787 (2005), an officer stopped a vehicle that he believed lacked a valid trip permit. The officer eventually asked the passenger for his name. The officer then took a credit card from the passenger. When calling the credit card company, the officer learned the card to be stolen. Our state Supreme Court reversed the passenger's conviction because the officer lacked grounds to ask the passenger for identification.

In *Barber v. Superior Court*, 30 Cal. App. 3d 326, 107 Cal. Rptr. 304 (1973), a law enforcement officer approached George Washington Barber's parked car as part of a community caretaking function. After awakening Barber and discerning that Barber needed no assistance, the officer demanded that Barber provide identification. With the identification, the officer called dispatch and learned of arrest warrants for Barber. When arresting him, the officer found tin foil rolls of heroin. The appellate court dismissed the

13

charges since the officer extended beyond his authority when demanding identification from Barber.

I next address Deputy Veronica Van Patten's touching of Corey Knudsvig's body and clothes. An officer may perform a protective frisk if he or she reasonably believes a suspect to be armed and dangerous. *State v. Smith*, 102 Wn.2d 449, 452, 688 P.2d 146 (1984). Nevertheless, if the officer searches the person of a nonarrested passenger of a car, the officer must have objective suspicion that the person searched may be armed and dangerous. *State v. Parker*, 139 Wn.2d at 501-02 (1999). The officer must point to specific, articulable facts tying observable movements and their circumstances directly and immediately to the individual to be frisked. *State v. Horrace*, 144 Wn.2d at 399-400 (2001). When officers lack an articulable suspicion that an individual is armed or dangerous and have no evidence to independently connect such person to illegal activity, a search of the person is invalid under article I, section 7. *State v. Parker*, 139 Wn.2d at 498.

To detain and search one not being arrested, officers must show more than a generalized fear of danger. *State v. Leffler*, 142 Wn. App. 175, 182-83, 178 P.3d 1042 (2007). The officer must articulate an objective rationale predicated specifically on safety concerns. *State v. Mendez*, 137 Wn.2d at 220 (1999). The suspicion of someone

14

being armed and dangerous must be individualized to the one being stopped and searched. *State v. Smith*, 145 Wn. App. 268, 276-77, 187 P.3d 768 (2008). If the officer possesses a reasonable fear for safety, the officer need not show a reasonable basis that the detainee is engaged in or is about to engage in a crime. *State v. Mendez*, 137 Wn.2d at 223.

Spokane County Sheriff Deputy Veronica Van Patten lacked any individualized suspicion that Corey Knudsvig was armed, let alone dangerous. Both Van Patten and Deputy Clay Hilton readily agreed that none of the passengers in the minivan, including Knudsvig, acted suspicious. The officers had no cause to believe anyone engaged in criminal behavior. By the time of Knudsvig's exit from the van, Clay Hilton had already handcuffed Justin Millette. No current criminal activity prompted the arrest of Millette. Four sheriff deputies were present to handle the remaining three passengers. The officers had no knowledge of any earlier violent history of Corey Knudsvig or the other passengers. No other traffic or persons were present. The area being a high crime area at night justified no individualized suspicion.

Both Deputies Clay Hilton and Veronica Van Patten testified to a general concern for officer safety. Neither sheriff deputy, however, testified of an individualized suspicion that Corey Knudsvig possessed a weapon or endangered their safety. The BB

15

gun tumbled from the van when Dara Murphy exited the van. Knudsvig then lay on the back seat of the minivan. Corey Knudsvig exhibited no threatening or aggressive behavior toward the officers. He immediately complied with Deputy Veronica Van Patten's command to exit the vehicle with his hands extended.

*State v. Mendez*, 137 Wn.2d 208 (1999) and *State v. Smith*, 145 Wn. App. 268 (2008) control this appeal. In *Smith*, this court reversed a conviction for possession of a controlled substance. Tana Smith arrived at a residence in a car at the same time that officers intended to serve a search warrant. Officers ordered Smith and others from the car at gunpoint. Officers then discovered methamphetamine inside the car. Officers testified that they had no knowledge as to why the occupants of the car were present. Therefore, this court held that officers had no individualized reasonable suspicion that Smith was a danger to the officers.

In *State v. Mendez*, 137 Wn.2d 208, police officers detained a car for failing to stop at a stop sign. The car's passenger, Efrain Mendez, exited the vehicle and quickly walked from the scene. Mendez did not heed an officer's command to return to the car and reached inside his shirt two times while running away. Officers chased Mendez, grabbed him, placed him under arrest, and searched him. During the search, they found a

16

marijuana pipe. After denying a CrR 3.6 motion to suppress the marijuana pipe, the trial

court found Mendez guilty of possessing paraphernalia.

In reversing the trial court's denial of Efrain Mendez's motion to suppress, the

*Mendez* Supreme Court held that the arresting officers possessed neither an objective

rationale that would allow them to order Mendez back into the vehicle in order to secure

the scene nor a reasonable suspicion that Mendez had engaged in or was about to engage

in criminal conduct. Mendez's running from the scene, without evidence that he

committed a crime or posed a threat to public safety, did not justify his detention.

In *State v. Bee Xiong*, 164 Wn.2d 506, 514, 191 P.3d 1278 (2008), the

Washington Supreme Court reversed the conviction of Bee Xiong for possession of

methamphetamine. The officer testified to a general concern for his safety. But the

officer never individualized the concern to Xiong. Xiong cooperated with the officer

during the police contact. Therefore, the search of Xiong's pants was unlawful.

The State emphasizes the falling of the gun from the minivan as justifying a frisk

of all passengers. Deputy Clay Hilton testified law enforcement training taught him that

the presence of one gun means the presence of two guns. He provided no details as to

from where he received this training. Hilton did not testify as to the chances that, if an

officer finds one gun, the officer will find another gun as opposed to officers merely

17

being trained to expect another gun.

True to Deputy Clay Hilton's testimony, law enforcement officers learn the "plus one rule" during training. According to one training handbook,

> When conducting a search on a person, always consider the "plus-one rule." If one weapon is found, you should assume that the suspect has two weapons. If two weapons are found, you should assume that there are three, and so on.

Robert S. Stering, *Police Officer's Handbook: An Introductory Guide* 90 (2005). Note that this quote refers to the suspect having more than one gun, not a companion of the suspect having a gun in addition to the suspect. One law journal suggests that the plus one rule motivates law enforcement officers to handle and examine innocent items in their effort to perform a meticulous search, which may appear far more invasive than what is warranted by the circumstances. Seth W. Stoughton, *Modern Police Practices: Arizona v. Gant's Illusory Restriction of Vehicle Searches Incident to Arrest*, 97 Va. L. Rev. 1727, 1770-71 (2011).

In Corey Knudsvig's appeal, the State cites no decision that adopts the plus one rule for purposes of search and seizure jurisprudence. The State forwards no precedent that holds that, if officers find one weapon, they gain license to search all persons and places in the vicinity for more weapons. A constitutionalist and Second Amendment advocate would fear the ramifications of such a rule. The United States Constitution's

18

No. 35169-6-III
*State v. Knudsvig* - dissenting

Second Amendment and Washington's Constitution article I, section 24 protect a citizen's right to bear arms. Presumably Dara Murphy and Corey Knudsvig had the right to bear arms. The result of the State's argument would authorize law enforcement officers to express fear for their safety in the presence of any firearm and thereby subject anyone in propinquity to the weapon to a violation of one's bodily privacy and personal autonomy.

*United States v. Black*, 707 F.3d 531 (4th Cir. 2013), teaches courts to reject the one plus rule and to consider the rule an abuse of police discretion. In the appendix, I provide the facts in the decision. For purposes now, the government convicted Nathan Black of unlawful possession of a firearm, which officers seized when patting Black's body for weapons. The government argued that law enforcement possessed authorization to search the person of Nathan Black because one of his colleagues, Dior Troupe, possessed a gun. The district court agreed with the government and denied the motion. The Circuit Court of Appeals reversed the conviction.

The *Black* court noted that a *Terry* stop required reasonable articulable suspicion that the individual was armed and dangerous. The appellate court admonished the government for using innocent circumstances to argue suspicious activity warranted a seizure and search. The court observed that, under the laws of North Carolina, a resident

19

could openly carry firearms. Troupe legally possessed and displayed his gun. The government contended that because other laws prevent convicted felons from possessing guns, the officers could not know whether Troupe was lawfully in possession of the gun until they performed a records check. Additionally, the government averred it would be "'foolhardy' for the officers to 'go about their business while allowing a stranger in their midst to possess a firearm.'" *Black*, 707 F.3d at 540. The reviewing court disagreed. The *Black* court observed that being a felon in possession of a firearm is not the default status. More importantly, when a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals.

With regard to the one plus rule, the Fourth Circuit Court of Appeals wrote:

> [W]ith respect to the officers' "Rule of Two" or "one-plus rule," we would abdicate our judicial role if we took law enforcement-created rules as sufficient to establish reasonable suspicion. "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions." As such, we must consider whether, in applying law enforcement rules, there are safeguards "to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field."

20

Here, the practical implication of applying the so-called "Rule of Two" is that anyone in proximity to an individual with a gun is involved in criminal activity. Such a rule subjects to seizure or search anyone who actively or passively associates with a gun carrier. The seizure has no connection with the individual seized, the activity they are involved in, their mannerisms, or their suspiciousness; rather, the seizure is a mere happenstance of geography. The absurdity of this rule may be gleaned from scenarios where an individual carrying a firearm walks into a monastery subjecting to seizure all of the nuns and priests, or an ice-cream shop subjecting all of the patrons to a seizure. Or could police officers apply this rule to seize all individuals at a shooting range or on a hunting trip? The scenarios abound. As there are no safeguards against the unlawful use of discretion by the officer applying such an arbitrary and boundless rule, it cannot be a basis for reasonable suspicion of criminal activity.

*United States v. Black*, 707 F.3d at 540-41 (internal citations omitted).

## Investigation of Crime

The State next argues that Spokane County Sheriff Deputy Veronica Van Patten held legal license to detain and search Corey Knudsvig because the officers investigated a crime. Under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), officers may briefly, and without a warrant, stop and detain a person they reasonably suspect is, or is about to be, engaged in criminal conduct. *State v. Mendez*, 137 Wn.2d at 223 (1999). Oftentimes a brief seizure for officer safety is considered a *Terry* investigative stop. One purpose of a *Terry* stop is to allay a fear of violence. *Terry v. Ohio*, 392 U.S.

21

at 30. In this section, I review only the State's contention that an investigation for crime justified Deputy Van Patten's questioning and searching Knudsvig.

For a valid *Terry* stop, the officer must be able to articulate specific facts from which it could reasonably be suspected that the person is engaged in or is about to engage in criminal activity. *Terry v. Ohio*, 392 U.S. at 21-22; *State v. Armenta*, 134 Wn.2d 1, 9-10, 948 P.2d 1280 (1997). An inarticulable hunch is insufficient. *State v. O'Cain*, 108 Wn. App. 542, 549, 31 P.3d 733 (2001).

The suspicion of crime must be based on objective facts. *State v. Larson*, 93 Wn.2d at 644 (1980). The suspicion of being engaged in criminal activity must be individualized to the one being detained. *State v. Smith*, 145 Wn. App. at 276-77 (2008).

I previously reviewed *State v. Smith*, 145 Wn. App. 268, in which this court reversed a conviction for possession of a controlled substance. Tana Smith arrived at a residence in a car at the same time when officers were about to serve a search warrant. In addition to holding that officers lacked a reasonable individualized suspicion that Smith posed a danger, this court held that officers lacked such a suspicion that Smith was about to engage in a crime.

22

The State claims its officers possessed authority to search Corey Knudsvig as part of an investigation as to whether someone violated RCW 9.41.050(2)(a). This statute reads:

> A person shall not carry or place a *loaded pistol* in any vehicle unless the person has a license to carry a concealed pistol and: (i) The pistol is on the licensee's person, (ii) the licensee is within the vehicle at all times that the pistol is there, or (iii) the licensee is away from the vehicle and the pistol is locked within the vehicle and concealed from view from outside the vehicle.

(Emphasis added.) The State fails to read the entire statute. The statute only proscribes conduct with regard to a loaded pistol. No officer found a pistol, let alone a loaded pistol. Thus, the statute did not justify a *Terry* stop and search.

Other reasons defeat the State's claim that the concealed weapons statute justified the search and questioning of Corey Knudsvig. RCW 9.41.050(2)(a) authorized a detention of Corey Knudsvig only if the State had individualized reasonable suspicion that the BB gun belonged to Knudsvig. Sheriff Deputy Veronica Van Patten lacked this suspicion. She never testified to a belief that Knudsvig owned the gun or earlier possessed the gun. One has no reason to ask an individual if he holds a concealed weapons permit unless one believes the person owns a gun. Until Deputy Van Patten ordered Knudsvig from the van, Knudsvig laid in the back seat. The gun tumbled from the van when Dara Murphy exited the van and at a time when Van Patten was not

23

present. No one told Van Patten that the gun might belong to Knudsvig. Murphy readily admitted to owning the ersatz gun.

The State does not argue that Veronica Van Patten searched Knudsvig's person in order to find any gun permit. The State cites no authority that allows the State to randomly search persons in proximity to a firearm to determine if that person owns the gun and holds a permit for the gun, or if he owns the gun and has a felony.

I do not base my dissent on a conclusion that Deputy Clay Hilton should have known that the weapon tumbling from the minivan was a BB gun at the time Hilton carried the gun from the ground to the hood of his patrol car. Nevertheless, one might question whether Hilton should have then known the nature of the gun. The trial court found that, at the time Deputy Clay Hilton heard the gun drop from the minivan, he could not discern if the gun was a firearm or a BB gun. The trial court never found, however, that once Hilton grabbed the instrument, he could not discern the object to be a BB gun. The absence of a finding on a factual issue leads to the presumption that the party with the burden of proof failed to sustain its burden. *State v. Armenta*, 134 Wn.2d at 14 (1997).

I recognize the difficulty in distinguishing between a BB gun and a handgun particularly from afar. Nevertheless, on holding the weapon and carrying it to his patrol

car, Deputy Clay Hilton, despite the hurry, probably could have discerned that he handled a BB gun and not a loaded pistol. The BB gun weighs less. A BB gun lacks a spot to insert a bullet. The BB gun possesses a pumping mechanism. The BB gun's exit for the projectile is a smaller diameter. Deputy Hilton did not explain why he could later discern the difference between the BB gun and a pistol, but not when he placed the gun on the patrol car.

## Pretext

United States Supreme Court precedent under the Fourth Amendment does not concern itself with pretextual searches and seizures. *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis. *Brendlin v. California*, 551 U.S. 249, 260, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). State law, including Washington law under Washington Constitution article I, section 7, differs.

In a decision weeping with sarcasm, the Wyoming Supreme Court held that law enforcement may not employ a stop as a pretext to search for evidence. *Brown v. State*, 738 P.2d 1092, 1095 (Wyo. 1987). Under other states' law, when the detaining is merely a subterfuge for conducting a search, the search is illegal despite the validity of the stop. *Commonwealth v. Freeman*, 222 Pa. Super. 178, 181, 293 A.2d 84 (1972). Apprehension

25

for personal safety cannot be employed to create an exception to the warrant requirement. *Commonwealth v. Johnson*, 777 S.W.2d 876, 880 (Ky. 1989).

Under Washington jurisprudence, the State must not use a search warrant exception as a pretext for an evidentiary search. *State v. Smith*, 165 Wn.2d at 517 (2009). Also, any claimed emergency may not act as a pretext for conducting a search. *State v. Leffler*, 142 Wn. App. at 182 (2007).

In *State v. Larson*, 93 Wn.2d 638 (1980), the state Supreme Court held the search of a passenger of a car to violate constitutional principles in part because the reasons proffered by law enforcement for the search did not coincide with the facts. Officers approached a car parked in the early morning hours allegedly because the driver parked the car more than one foot from the curb in a high crime area. The officers drove behind the parked car, at which time the driver of the car started the engine and pulled from the curb. The officer driving the patrol car flashed the car's emergency lights and the driver stopped the car. One of the officers approached the passenger's side of the car and asked the passenger for identification. The passenger opened her purse. The officer shined his flashlight in the purse and spotted marijuana therein.

In reversing the conviction for possession of a controlled substance, the *Larson* high court noted that the officers never asked the driver about the alleged illegal parking.

26

During a suppression hearing, the officer who searched the purse justified the search from a fear for weapons. Nevertheless, the officer never searched the passenger beyond looking in the purse. The *Terry* stop was unlawful because the driver and the passenger performed no suspicious act. The court also rejected the State's emphasis that the stop occurred in a high crime area. Many individuals stuck in poverty must inhabit high crime areas.

Deputy Veronica Van Patten testified that, when she arrived at the location of the minivan, she understood that officers were engaged in a general criminal investigation. As part of this investigation for individuals with warrants for arrest, she asked Corey Knudsvig for identification. She did not seek this information because of any concern that he was a danger or because he might own the gun that fell from the vehicle.

The State seeks to justify the frisk of Corey Knudsvig because of officer safety. Nevertheless, Veronica Van Patten did not immediately pat Knudsvig as part of a *Terry* investigatory stop. If she was concerned for her safety, she would have immediately frisked Knudsvig as he exited the minivan. Instead, she asked Knudsvig for his name and went to her patrol car to discern if Knudsvig had warrants for his arrest. After learning of a warrant, Van Patten patted Knudsvig as a search incident to arrest, not as part of a *Terry* stop.

27

No. 35169-6-III
*State v. Knudsvig* - dissenting

The State also seeks to justify the frisk of Corey Knudsvig on the ground of an investigation for a violation of the concealed weapons statute, RCW 9.41.050(2)(a). Nevertheless, officers had no reason to believe the gun belonged to Knudsvig or that the gun was a loaded pistol. The gun was a BB gun. More importantly, no officer took any steps to determine if the gun belonged to Knudsvig. No one asked him if he owned the gun or had a license for any gun. No sheriff deputy performed any research to learn whether the State issued any of the occupants a concealed weapons permit. Dara Murphy readily admitted to owning the BB gun. The frisk of Knudsvig had no relationship to any possible violation of RCW 9.41.050(2)(a). The questioning of Knudsvig was part of an unlawful gathering of evidence to determine if the passengers had arrest warrants. The frisk of Knudsvig was pursuant to an unlawful arrest of Knudsvig, not as part of an investigation of ongoing criminal behavior.

## Beyond Scope of *Terry* Frisk

Even if Deputy Veronica Van Patten had an individualized reasonable suspicion that Corey Knudsvig posed a danger to her or other officers, her patting of Knudsvig went beyond legal authority. A protective search also would not authorize gathering Corey Knudsvig's name and running the name through a patrol car's computer.

28

*Terry* stops may not be expanded into generalized, investigative detentions or searches. *State v. Veltri*, 136 Wn. App. 818, 822, 150 P.3d 1178 (2007). A generalized concern for officer safety has never justified a full search of a nonarrested person. *State v. Parker*, 139 Wn.2d at 501 (1999). The detention of the purported dangerous person must be no greater than that needed to secure officer safety. *State v. Johnson*, 11 Wn. App. 311, 316, 522 P.2d 1179 (1974). Stated differently, a search for weapons must be strictly circumscribed by the exigencies that justify its initiation and thus limited to a search for weapons that might be used to harm the officer. *State v. Parker*, 139 Wn.2d at 499-500. The *Terry* stop must be limited to a weapons search. *Terry v. Ohio*, 392 U.S. at 30 (1968). The purpose of the search is to insure officer safety not to procure evidence for use at a subsequent trial. *Foster v. State*, 285 Ga. App. 441, 443-44, 646 S.E.2d 302 (2007).

*Terry* allows police to conduct a limited pat-down of a suspect's outer clothing to try to locate potentially dangerous weapons when specific facts exist to support a safety concern. *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002); *State v. Russell*, 180 Wn.2d 860, 867, 330 P.3d 151 (2014). The officer may withdraw an object if it feels like a weapon. *State v. Horton*, 136 Wn. App. 29, 38, 146 P.3d 1227 (2006). If the object feels otherwise, the officer may not seize it. *State v. Allen*, 93 Wn.2d 170, 172,

29

No. 35169-6-III
*State v. Knudsvig* - dissenting

606 P.2d 1235 (1980). This court has rejected the argument that even the tiniest of objects can be used offensively such as to justify its seizure. *State v. Horton*, 136 Wn. App. at 38. The protective search must be justified in scope throughout the duration of the search. *State v. Hudson*, 124 Wn.2d 107, 112, 874 P.2d 160 (1994).

Spokane County Sheriff Deputy Veronica Van Patten did not confine her handling of Corey Knudsvig's body to the patting of his outer clothing. Despite finding no hard object on Knudsvig, she reached into his pants and withdrew a soft, plastic baggie of heroin.

This dissent does not belittle the value of officer safety. I recognize the sacrifice of law enforcement officers, including sometimes the ultimate sacrifice of life. If a law enforcement officer holds a genuine concern for his or her safety or the safety of other officers, the officer should act on that concern by immediately detaining and frisking the one posing the danger rather than performing other tasks to gather grounds to arrest the detainee. The State's position in this appeal unfairly seeks to take advantage of concerns for officer safety.

Fearing, J.

30

No. 35169-6-III
*State v. Knudsvig* - dissenting

Appendix

In *United States v. Black*, 707 F.3d 531 (4th Cir. 2013), at 10:00 p.m. on June 15, 2010, uniformed Officers Matthew Zastrow and Shane Strayer rode in a marked police vehicle, while patrolling the Eastway Division of Charlotte, North Carolina. Law enforcement knew apartment complexes in the Eastway Division for armed robberies and other violent crimes. As the officers patrolled, they observed a vehicle parked at the pump of a gas station. Though neither officer saw the vehicle pull into the gas station, during the approximately three-minute observation, the officers saw that the driver and sole occupant of the vehicle did not leave the car, pump gas, or enter the convenience store. Officer Zastrow believed this type of behavior was indicative of a drug transaction. On this basis, the officers ran the license tag of the vehicle, which retrieved no outstanding traffic violations, and followed the vehicle as it traveled to a nearby parking lot located between two apartment complexes.

At the parking lot, the officers observed the driver of the vehicle, later identified as Dior Troupe, park his vehicle and walk toward a group of five men in a semi-circle speaking and laughing with each other. Four of the men stood, and a male later identified as Nathan Black, sat at the left-end of the semi-circle. The six men saw the police

31

vehicle but did not react. Neither officer observed the men engage in any criminal activity.

Officer Matthew Zastrow drove out of view and contacted other police units for assistance because he and Officer Shane Strayer wished to make "'voluntary contact'" with the men. *Black*, 707 F.3d at 535. The officers deemed the contact unwise without assistance. Officers Butler and Lang were in the immediate area and joined Officers Zastrow and Strayer in an adjacent parking lot. The four officers returned in their marked police vehicles to the same parking lot where they saw the men in the semi-circle. Three other officers, Fusco, Conner, and Harris, later joined the first four officers.

At 10:15 p.m., the four uniformed officers exited their marked patrol vehicles and walked toward the men. Officers Matthew Zastrow and Shane Strayer recognized one of the men in the group as Charles Gates. They had spoken with Gates two weeks before about his residence in one of the nearby apartments. Officer Zastrow knew of Gates's prior felony drug arrests. Officer Strayer had previously arrested Gates for driving while intoxicated and drug offenses, and another officer once tasered Gates.

As the officers approached the men, Dior Troupe motioned to the officers with his hands indicating that he had a firearm in a holster on his hip in plain view. Officer Shane Strayer seized Troupe's firearm, obtained Troupe's driver's license, and secured the

32

firearm in a patrol vehicle. Officer Strayer stated that although North Carolina permits a person to openly carry a firearm, in his years in the Eastway Division, he had never seen anyone do so.

Officer Matthew Zastrow testified he had been trained to operate on the "'Rule of Two,'" that is, if the police find one firearm, another firearm will "'most likely'" be in the immediate area. *Black*, 707 F.3d at 535. Officer Shane Strayer also testified he received training on the "one-plus" rule, that where there is one gun, there usually is another gun. *Black*, 707 F.3d at 535. Officer Strayer acknowledged that this "'rule'" was not always accurate. *Black*, 707 F.3d at 535.

After securing Dior Troupe's gun in the police vehicle, Officer Strayer frisked Troupe and all the other men in the group. By this time, a total of six officers were present. Officers Fusco and Conner stood at a distance of about ten to fifteen feet from the men to ensure no other individuals walked up to the locale of the police encounter with the men.

While Officer Shane Strayer secured Dior Troupe's gun, Officer Matthew Zastrow introduced himself to the men. He asked if any of the men lived in the apartments or if they were visiting. At that point, Nathan Black, who was still sitting, offered Officer Zastrow his North Carolina identification card. To Officer Zastrow, Mr. Black's

volunteering his identification was unusual particularly when the remaining individuals in the group argued and did not give any information. From Black's card, Officer Zastrow believed that Black lived outside the Eastway Division. Black confirmed this belief by informing Officer Zastrow that he was visiting friends in the area.

Officer Matthew Zastrow pinned Nathan Black's identification card to his uniform and continued to obtain identification information from the other individuals. Officer Zastrow testified that the other individuals did not have physical identification, so he wrote their names, addresses, and birthdates in a notebook. Zastrow described Black's behavior during this encounter as "extremely cooperative." *Black*, 707 F.3d at 536.

By this time, Officer Shane Strayer had frisked Troupe and proceeded to frisk Nicolas Moses, who stood within the semi-circle. While Officer Strayer patted Moses, Officer Matthew Zastrow noticed that Black grew "'fidgety,'" sat forward in his chair, and looked left and right. *Black*, 707 F.3d at 536. In Officer Zastrow's training and experience, an individual's looking left and right presents a "'cue'" that the individual seeks to flee. *Black*, 707 F.3d at 536. To Officer Fusco, who also observed the behavior, the glancing from side to side indicates that the individual seeks a path to escape.

Nathan Black stood, announced he was going home, and walked toward the apartments. Officer Matthew Zastrow walked in front of Black and instructed him that

34

he was not free to leave and must sit down. In response, Black said "'I can't go home?'" or "'I can't leave?'" and continued walking away. *Black*, 707 F.3d at 536.

Officer Matthew Zastrow grabbed Nathan Black's left bicep with his left hand. According to Officer Zastrow, he could feel Black's "'extremely fast'" pulse through Black's t-shirt, which he believed was a sign of nervousness. *Black*, 707 F.3d at 536. Black pulled away from Officer Zastrow and ran toward an apartment building. Officers Zastrow and Fusco told Black to stop, and, when he refused, they chased him. Fusco grabbed Black from behind and tackled him to the ground. Zastrow grabbed Black's wrist to handcuff him. As he did so, Officer Zastrow felt a metal object underneath Black's hand and clothing, which Zastrow immediately recognized as a firearm. Zastrow yelled "'gun'" and held onto Black's hand until the firearm fell to the ground. *Black*, 707 F.3d at 536. Officer Zastrow placed Black in handcuffs and arrested him.

The government charged Nathan Black with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Black moved to suppress the firearm on the basis that it was the fruit of the unlawful seizure of his person. At a hearing on the motion to suppress, Black argued that he was unlawfully seized when he was told he could not leave, and the seizure was not supported by reasonable articulable suspicion. The government argued that until Officer Matthew Zastrow grabbed Black's

35

bicep, law enforcement had not seized Black for Fourth Amendment purposes, and his seizure was supported by reasonable suspicion. The district court agreed with the government and denied the motion.

The Circuit Court of Appeals reversed the conviction. The court noted that a *Terry* stop requires reasonable articulable suspicion that the individual engages in criminal activity. A detention occurred because Officer Zastrow, surrounded by numerous other law enforcement officers, told Black he could not leave. The district court ruled that Officer Zastrow could frisk Black, in part, for weapons because of the display of a firearm by Dior Troupe. The appellate court admonished the government for using innocent circumstances to argue suspicious activity warranted a seizure and search.

The reviewing court noted that, under the laws of North Carolina, a resident could openly carry firearms. Dior Troupe legally possessed and displayed his gun. The government contended that, because other laws prevent convicted felons from possessing guns, the officers could not know whether Troupe lawfully possessed the gun until they performed a records check. Additionally, the government averred that their conduct would be "'foolhardy'" if they went "'about their business while allowing a stranger in their midst to possess a firearm.'" *Black*, 707 F.3d at 540. The reviewing court disagreed. The court observed that being a felon in possession of a firearm was not the

36

No. 35169-6-III
*State v. Knudsvig* - dissenting

default status. More importantly, when a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals.